**SO ORDERED.**

**SIGNED this 17 day of October, 2019.**

_____

**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

**IN RE:**

| | |
|---|---|
| **RANDY P. COLEY,** | **Case No. 18-02154-5-JNC** |
| **Debtor** | **Chapter 7** |

_____

**RICHARD D. SPARKMAN, Chapter 7 Trustee,**
    **Plaintiff,**

    **v.**                                            **Adv. Pro. No. 18-00121-5-JNC**

**RANDY P. COLEY, a/k/a RANDY POWHATAN
COLEY a/k/a RANDY COLEY; KIMBERLI M.
COLEY a/k/a KIMBERLY M. COLEY, and
ITS THUNDERTIME LLC, a Delaware Limited
Liability Company d/b/a IT'S THUNDERTIME,
LLC,**
    **Defendants.**

## MEMORANDUM OPINION

The trial of this adversary proceeding was conducted on July 30 and 31, 2019, in Greenville, North Carolina. The parties requested an opportunity to submit post-trial briefs on two discrete issues, which was allowed, and the matter is now ready for determination.[1]

---

[1] Post-trial briefs were filed on September 10, 2019, by the Trustee, AP D.E. 51, and by Mrs. Coley, AP D.E. 52. Mr. Coley did not file a separate post-trial brief.

## BACKGROUND

Randy P. Coley filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on April 30, 2018. On July 16, 2018, a consent order was entered appointing Richard D. Sparkman as chapter 11 trustee (the "Trustee), BR D.E. 81.[2] The case was converted to one under chapter 7 on August 16, 2018, BR D.E. 116. As explained more fully below, the Trustee filed an adversary proceeding, *Sparkman v. Its Thundertime LLC, a Delaware Limited Liability Company, Randy P. Coley, and Kimberli Coley (In re Coley)*, Adv. Pro. No. 18-00113-5-JNC, seeking a determination that the assets of Its Thundertime LLC ("Thundertime") are assets of Mr. Coley's bankruptcy estate subject to administration by the Trustee. A consent judgment was entered to that effect on May 2, 2019. *See* Adv. Pro. No. 18-00113-5-JNC, D.E. 61. The complaint in this adversary proceeding was filed by the Trustee on November 21, 2018, seeking to avoid the transfers of two parcels of real property from Thundertime to Mr. and Mrs. Coley as tenants by the entireties so that the Trustee could administer the property as assets of Thundertime.[3]

## JURISDICTION

This court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and is authorized to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (H), which this court has the jurisdiction to hear and determine. All parties have expressly consented to the court's exercise of jurisdiction pursuant to 28 U.S.C. § 157(c)(2).[4]

---

[2] References to docket entries in this adversary proceeding will be cited as "AP D.E. __," and references to docket entries in the underlying bankruptcy case will be cited as "BR D.E. __."

[3] Thundertime failed to file an answer or other responsive pleading, and default was entered on January 15, 2019, AP D.E. 16. The motion for default judgment as to Thundertime, AP D.E. 22, will be separately addressed after entry of this memorandum opinion and the related judgment.

[4] *See* Final Pretrial Order, AP D.E. 38 at 2.

## FACTS

**The DIRECTV Judgment and Pierced Corporate Veil**

Since the early 1990's, Mr. Coley has been in the business of installing the infrastructure for cable television systems throughout the country. One such project was for the Massanutten Resort in Virginia,[5] which later became the subject of protracted litigation between Sky Cable, LLC, DIRECTV, Inc., Mr. Coley, and others, Civil Action No. 5:11cv00048 in the United States District Court for the Western District of Virginia (the "Virginia Litigation"). A judgment was entered on January 23, 2014 in favor of DIRECTV against Mr. Coley and his company, East Coast Cablevision, LLC, in the amount of $2,393,000 based upon 2,393 violations of 28 U.S.C. § 605(a) at the statutory rate of $1,000 per violation (the "Judgment"). Ex. 1. No appeal was taken from the Judgment.

Unable to collect the Judgment from Mr. Coley or East Coast Cablevision, LLC, DIRECTV filed a supplemental proceeding in the Virginia Litigation seeking to reverse-pierce the corporate veils of three entities owned by Mr. Coley: Thundertime, East Coast Sales LLC, and South Raleigh Air LLC. Ex. 2. A hearing was conducted on November 19, 2015, Ex. 3, and on July 18, 2016, a memorandum opinion, order, and amended judgment were entered by the district court in the Virginia Litigation holding Thundertime, East Coast Sales LLC and South Raleigh Air LLC jointly and severally liable on the Judgment as alter egos of Mr. Coley. Exs. 24, 25, and 6 (the "Amended Judgment"). The Amended Judgment was appealed to and affirmed by the United

---

[5] Massanutten is a ski and golf resort that includes hotels, condominiums and other services and facilities owned and/or operated by Great Eastern Resort Management, Inc. Located within it are a timeshare condominium complex at 4082 Peak Drive managed by the Mountainside Villas Owners Association, numerous independently owned condominiums and single-family homes managed by the Massanutten Properties Owners Association, and several bars, restaurants, golf course clubhouses, health clubs, a ski area and a water park. *See* Decl. of Keith N. Waite, Ex. 11 to Decl. of John H. Jamnback submitted in Adv. Pro. No. 18-00118-5-JNC, D.E. 17-2 at 115, ¶ 27.

States Court of Appeals for the Fourth Circuit in a published opinion dated March 28, 2018, *Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375 (4th Cir. 2018), Ex. 41, with the final mandate issued on July 16, 2018. Ex. 42. The district court found, and the appellate court confirmed, that based on the testimony of both Mr. and Mrs. Coley, Mrs. Coley had no interest in Thundertime.[6] Thereafter, the Virginia court also issued an order on August 12, 2016, enjoining Thundertime and Mr. Coley from "selling or removing any real property from the Assets[7] or transferring any funds included within the Assets, without the express permission of" the court. Ex. 7 at 8, ¶ 17.

When Mr. Coley filed his petition for relief in this court, he conceded that the assets and liabilities of Thundertime and the other entities were assets and liabilities of the bankruptcy estate. *See* BR D.E. 42 at 1, ¶ 8. Within his Report Regarding Assets, Liabilities and Financial Affairs of Entities in which the Debtor Holds a Substantial or Controlling Interest, BR D.E. 34 (the "Related Entities Report"), Mr. Coley submitted "mock schedules" for Thundertime and the other companies subject to the Amended Judgment. Ex. 11.

---

[6] The record of the Virginia Litigation reflects that DIRECTV stipulated to the dismissal of the claims made against Mrs. Coley in consideration of her surrender of any interest or claim of an ownership interest in Thundertime, which effectively released her from any potential liability in that case. Later in that case, she re-asserted her claim of an interest in Thundertime and appealed the Amended Judgment to the Fourth Circuit, which appeal was consolidated into Mr. Coley's appellate case. The Fourth Circuit determined that she held no interest in Thundertime. In this adversary proceeding, the parties stipulated that Mrs. Coley was not a member of Thundertime; however, she testified that at the time of the transfers of property into Thundertime, she believed she was or would be a 50% owner in exchange for those transfers. This court need not delve into questions regarding ownership because the alter ego issue has been conclusively determined by another court and because of the stipulations in this action.

[7] "Assets" are defined in the order as "Any and all real property, bank accounts, investment accounts, and accounts receivable owned or held in the name of Randy Coley . . . [and] Its Thundertime, LLC . . . " subject to exceptions not relevant here. Ex. 7 at 3, ¶ 2. The order also appointed a receiver of the Assets to enforce the Amended Judgment; however, that portion of the order was stayed pending the appeal of the Amended Judgment. *Id.* at 3. Paragraph 17, which enjoined the transfer of Assets, was explicitly not stayed.

**The Formation and Assets of Thundertime**

Prior to 2008, Mr. and Mrs. Coley jointly and individually owned several investment parcels of real property (both residential and commercial). According to Mrs. Coley, they intended to resell (or "flip") the properties immediately, but the area real estate market declined and the properties could not be sold at a gain. As a result, she said, they created Thundertime in 2008 and transferred the properties to it to manage the real estate as rental properties. At the same time, she testified, they decided to transfer their own residence at 202 Brittany Place, Cary, North Carolina (the "Residence") to Thundertime to protect themselves from tort liability should a guest be injured at their home.[8] The following properties were transferred to Thundertime on April 25, 2008:

| Address | Grantor |
|---|---|
| 8146 McGuire Drive, Raleigh | Mrs. Coley |
| 505 Gooseneck Drive, Cary | Mrs. Coley |
| 315 Jones Franklin Road, Raleigh | Mr. and Mrs. Coley |
| 210 Concannon Court, Cary | Mr. and Mrs. Coley |
| 4336 Island Drive, N. Topsail Beach | Mr. and Mrs. Coley |
| 3004 Air Park Road, Fuquay Varina | Mr. and Mrs. Coley |
| 1405 Highview Court, Raleigh | Mr. and Mrs. Coley |
| 1150 Executive Circle, Unit 1, Cary | Mr. and Mrs. Coley |
| 1441 W. Market Street, Smithfield | Mr. and Mrs. Coley |
| 202 Brittany Place, Cary | Mr. and Mrs. Coley |
| 114 Drummond Place, Raleigh | Mr. Coley |
| 1408 Highview Court, Raleigh | Mr. Coley |
| 3006 Air Park Road, Fuquay Varina | Mr. Coley |
| 3008 Air Park Road, Fuquay Varina | Mr. Coley |
| 3001 Air Park Road, Fuquay Varina | Mr. Coley |
| 51 Poppy Trail, Durham | Mr. Coley |

---

[8] In considering the stated reason for the Transfers, it should be noted that by transferring the Residence to Thundertime, an entity owning substantial assets, the Coleys subjected all of the assets of Thundertime to potential tort liability for an injury at their home, rather than only their own individual assets. Regardless of the soundness of the decision, however, that was the stated reason for the transfer of the Residence (and later, the Lake House) to Thundertime. That said, the reason for the Transfers *to* Thundertime is not particularly relevant to the matter before the court except to the extent it reflects an understanding and pattern of shielding assets from creditors and potential creditors.

On November 8, 2010, Mr. and Mrs. Coley purchased property at 310 Harbor Drive, Macon, North Carolina (the "Lake House"), which they almost immediately transferred to Thundertime by deed of December 10, 2010. As with the Residence, Mrs. Coley testified that they transferred the Lake House to Thundertime primarily to create protection from tort liability from guests staying at the Lake House. At all times, the Coleys treated the Residence and the Lake House as their own properties – they continued to reside in the Residence and used the Lake House frequently, neither property was rented to others, and the Coleys made the mortgage payments on both properties from their personal bank accounts.

The testimony with respect to the operations of Thundertime was inconsistent, but is best summarized as follows: Mrs. Coley was responsible for locating, purchasing, and renovating properties to be flipped – and maintaining and renting the properties that could not be sold quickly – while Mr. Coley handled the financial part of the business.[9] While they each testified that Mrs. Coley was to receive $60,000 per year for her services, plus half of the resale profits, they could not produce any electronic or written evidence to support and memorialize that asserted agreement. R. Coley test., AP D.E. 48 at 71:5-11, 73:5-17. Mr. Coley testified that "I was married to her so I got the other 50 percent. That's how it worked." *Id.* There was also no evidence of Mrs. Coley receiving the salary, or any profit distribution, until 2016, although it did appear that money from rentals and sales paid to Thundertime rapidly ended up in Mrs. Coley's bank account where those funds were used for household expenses and to pay the mortgages on the Residence, the Lake House, and the Topsail Beach home. Further, Mr. Coley suggested that Mrs. Coley's activities did not require much time:

> . . . she would buy – you know, in 26 years, we only – we bought 19 or 20 or 30
> properties. It doesn't take long once she hones in on a piece of property to make it

---

[9] This is in contrast to the Coleys' testimony in the Virginia court that Mrs. Coley had no involvement in Thundertime or knowledge of what it did.

> happen. And once she makes the deal work, then she walks away from it. She doesn't have a full time job. She goes out and buys the properties, finds out what needs to be done with them, hires contractors, and she does very little, if anything, after she purchases it other than when I see her when she comes to the office [to reconcile papers].

R. Coley test., AP D.E. 48 at 38:4-12. On the other hand, he repeatedly testified that operating Thundertime became too much for Mrs. Coley to handle as described below.

On July 14, 2015 and November 6, 2015, the mortgages on the Residence and the Lake House were refinanced by Branch Banking & Trust Co. ("BB&T"), with Thundertime as the borrower and the Coleys as guarantors of the new debt. *See* Exs. 12, 13, and 14. Proceeds from the refinance were also used to satisfy the mortgages on most of Thundertime's rental properties (including the house on North Topsail Island), making "ITT more healthy" by unencumbering most of its rental properties and reducing its debt by shifting it to the Coleys. R. Coley test., D.E. 48 at 92:17-93:1; 93:24-14.

On February 18 and 19, 2016, after the hearing on piercing the corporate veil in the Virginia Litigation in November 2015 and before the district court ruling issued in July 2016, the Coleys attempted to have Thundertime to issue two deeds transferring the Lake House and the Residence to them jointly as tenants by the entireties (the "Transfers"), Exs. 4 and 5. The deed to the Lake House, Ex. 4, appears to be legally sufficient to effectuate that transfer; the deed to the Residence, however, is executed by the Coleys as grantors without reference to their representative capacity for Thundertime. Ex. 5. In other words, it is signed by the Coleys individually rather than as a manager, member, or officer of Thundertime, which is a limited liability company.

At the time of the Transfers (or purported transfer with respect to the Residence), it is undisputed that there was $250,000 of equity in the Residence and $300,000 of equity in the Lake House. Pursuant to his authority to administer assets of Thundertime to satisfy Mr. Coley's debts,

and assuming that the deed for each property conveyed it from Thundertime to the Coleys as tenants by the entireties, the Trustee seeks to avoid the Transfers pursuant to 11 U.S.C. § 544 and North Carolina General Statutes §§ 39-23.4(a)(1) and (2).

## DISCUSSION

Section 544(b) of the Bankruptcy Code gives a bankruptcy trustee the authority to avoid transfers that are voidable under applicable law by a creditor holding an allowable unsecured claim. The Trustee here seeks to avoid transfers under North Carolina law that would be voidable by DIRECTV, which holds an allowable unsecured claim in this chapter 7 case that extends to Thundertime due to the consent judgment referenced above.

DIRECTV was a creditor of Mr. Coley at the time of the Transfers, but because the July 2016 Amended Judgment had not yet been entered, it was not a creditor of Thundertime on the date the Transfers were made. Therefore, in order to avoid the Transfers under § 544, the Trustee relies on North Carolina General Statutes § 39-23.4(a), which provides:

> (a) A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> > (1) With intent to hinder, delay, or defraud any creditor of the debtor; or
> > (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> > > a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > > b. Intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

N.C. Gen. Stat. § 39-23.4(a).

Thus, to prevail, the Trustee must show that the Transfers were made with actual intent to hinder, delay or defraud a creditor of Thundertime, **_or_** that Thundertime was or became insolvent

as a result of the Transfers and did not receive reasonably equivalent value in exchange for the Transfers. The Trustee contends that he has met his burden of proving both.

**The Validity of the Deed from Thundertime to the Coleys**

The first question before the court is whether the deed purporting to transfer the Residence from Thundertime to the Coleys actually conveyed that property. If it did not, then there was no transfer to avoid and the Residence remains titled to Thundertime rather than Mr. and Mrs. Coley. In that event, the Trustee may administer the Residence as an asset of Thundertime without regard to Mr. and Mrs. Coley's claims of ownership. If the deed is valid, then there was a legally effective transfer, and the court must consider whether that transfer is voidable under § 39-23.4(a).

The deed in question is a Quitclaim Deed executed on February 18, 2016, identifying the grantor as "It's Thundertime, LLC" and the grantees as "Randy P. Coley and Kimberli M. Coley, a married couple." Ex. 5.  The signature block in the Quitclaim Deed reads:

> In Testimony Whereof, said Grantor has hereunto set her hand and seal the day and year first above written.

> [*signature*]_____ (SEAL)      [*signature*]_____(SEAL)
> Randy P. Coley                Kimberli M. Coley

Ex. 5 at 2. The notary block indicates that the Coleys personally appeared before the notary and "acknowledged that they are Managers of It's Thundertime, LLC and that they as Managers, being

duly authorized to do so, acknowledged, on behalf It's Thundertime, LLC, the due execution of the foregoing instrument." *Id.* (errors in original).[10]

The issue is that the Coleys signed the deed individually, and not in their representative capacity as managers or members of Thundertime. Accordingly, the deed was not executed by the Grantor. Whether the error in execution is fatal to the conveyance was the subject of post-trial briefing by the Trustee and Mrs. Coley.[11]

The Trustee maintains that the deed fails to convey the Residence from Thundertime to the Coleys, as it is not duly executed by Thundertime (the grantor) as required by North Carolina law. Specifically, where an entity is the grantor, the face of the instrument must reflect that the individual "duly authorized" to sign the deed did so "in the ordinary course of business on behalf of" the limited liability company. N.C. Gen. Stat. § 47-18.3(a). The face of the deed does not reflect that Mr. and Mrs. Coley signed the deed on behalf of Thundertime, nor does it reflect that they were duly authorized to sign the deed. The notary block simply states that the Coleys

---

[10] In contrast, signature block on the deed to the Lake House reads:

> IN WITNESS WHEREOF, the party of the first part has caused this instrument to be executed in its name by its Member-Managers, all by authority of its Board of Directors duly given.
>
> ITS THUNDERTIME, LLC
>
> By: [*signature, member*]_____
> Randy Powhatan Coley, Member-Manager
>
> ITS THUNDERTIME, LLC
>
> By: [*signature, member*]_____
> Kimberli Meyers Coley, Member-Manager

Ex. 4 at 2. The notary block in that deed indicates that the Coleys came before the notary and "acknowledged that they are Member-Managers of Its Thundertime, LLC, and that by the authority duly given and as the act of the corporation the foregoing instrument was executed in its name by them as its Member-Managers." *Id.*

[11] Mr. Coley did not submit a separate post-trial brief.

acknowledged their own signatures, not that they were signing on behalf of Thundertime. Accordingly, the Trustee maintains that the deed is entirely invalid on its face, as the grantees (the Coleys) essentially executed a deed for property they did not own to themselves.

The Trustee further contends that to the extent the deed is ambiguous, the ambiguity cannot be resolved in favor of conveyance because the deed is a quitclaim deed, not a warranty deed. Because of the inconsistency in the singular and plural use of Grantor(s) and Grantee(s), and the use of "her" referencing the signer of the deed, at best each alternative reading is equally plausible. As a result, the Trustee maintains, the deed is void. *See Mason v. Crescent State Bank (In re Deuce Invs.)*, Adv. Pro No. 10-155-8-RDD, 2011 Bankr. LEXIS 4627 at *9-11 (E.D.N.C. Bankr. May 27, 2011) (patent ambiguity exists and voids deed where "there is such uncertainty on the face of the document that a court by reading the language in light of all the facts and circumstances referred in the instrument, is unable to derive therefrom the intention of the parties as to what land was to be conveyed").

In contrast, Mrs. Coley maintains that (1) the parties stipulated that the Residence was transferred from Thundertime to the Coleys, and (2) under North Carolina law, the deed is to be construed on the basis of the intent of the parties as it appears from all provisions of the instrument, *see* N.C. Gen. Stat. § 39-1.1(a), and it is clear that the intent was to transfer the Residence from Thundertime to the Coleys. Specifically, Mrs. Coley contends that the definitions of Grantor and Grantees in the recital combined with the notary acknowledgment that indicates Mr. and Mrs. Coley were the managers of Thundertime demonstrate the intent, and that the inconsistent provisions have no effect. Mrs. Coley maintains that the ambiguity of the capacity in which she and Mr. Coley signed the deed is clarified in the notary acknowledgment, which "describes the Coleys as signing the instrument in their capacity as ITT Managers." AP D.E. 52 at 4-5.

11

The deed, however, does not reflect that the Coleys executed it in any capacity on behalf of Thundertime. The signatures are not qualified, and the notary block does not state or provide that they signed or executed the deed in their capacities as managers of Thundertime, but only that they "acknowledged" on behalf of Thundertime the execution of the deed. There is simply no signature by Thundertime as grantor on the deed, and thus no transfer ever occurred under North Carolina law.[12] The grantor signatures on the deed are those of individuals, not that of an LLC. Having chosen the advantages of LLC ownership as a shield from liability, the Coleys cannot now waive LLC restrictions at their apparent whim and avoid strict adherence to the necessary formalities, particularly with respect to documents on the public record upon which third parties rely.

The fact that the parties entered a stipulation as to the validity of the deed does not change that the deed on the public record says what it says and is ineffective to convey title. Finally, even if the deed and the erroneous signatures were found to be valid, the transfer of the Residence to the Coleys is avoided for the reasons stated below.

**Intent to Hinder, Delay, or Defraud**

North Carolina General Statutes § 39-23.4(a)(1) provides that a transfer made by a debtor is voidable as to a transferee if the transfer was made "with intent to hinder, delay, or defraud any creditor of the debtor." N.C. Gen. Stat. § 39-23.4(a)(1). Actual intent is inherently difficult to determine. However, "[b]ecause a debtor is not likely to testify that he had the requisite intent to defraud creditors, the intent to hinder, delay, or defraud can be inferred from extrinsic evidence and the presence of badges of fraud." *In re Clarkson*, 387 B.R. 882, 887 (Bankr. S.D. Fla. 2008).

---

[12] The Trustee also briefed the avoidability of the deed due to the defective execution under the Bankruptcy Code. While it may also be avoidable pursuant to 11 U.S.C. § 544, the court need not reach that issue because it determines that the deed is and has always been of no effect.

The statute itself "provides a non-exhaustive list of badges of fraud to be considered in determining intent under subsection (a)(1)." *Id.* at 889 (citing N.C. Gen. Stat. § 39-23.4(b)). "When analyzing these factors to make a determination of the debtor's intent, a court should evaluate the entirety of the circumstances surrounding the transaction at issue and 'may appropriately take into account all indicia [negating] as well as those suggesting fraud.'" *In re Schofield-Johnson, LLC*, 462 B.R. 539, 543 (Bankr. M.D.N.C. 2011) (quoting N.C. Gen. Stat. § 39-23.4(b) cmt. 6). Badges of fraud may be considered by the court in evaluating the debtor's intent: "[A] determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor." *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 353 (4th Cir. 2007) (quoting *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 252 (10th Cir. 1987)).

The thirteen most common factors used in determining whether a transfer was made with the actual intent to hinder, defraud, or delay a creditor are listed in the statute:

(1) The transfer or obligation was to an insider;
(2) The debtor retained possession or control of the property transferred after the transfer;
(3) The transfer or obligation was disclosed or concealed;
(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) The transfer was of substantially all the debtor's assets;
(6) The debtor absconded;
(7) The debtor removed or concealed assets;
(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) The transfer occurred shortly before or shortly after a substantial debt was incurred;
(11) The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor;
(12) The debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due; and

(13) The debtor transferred the assets in the course of legitimate estate or tax planning.

N.C. Gen. Stat. § 39-23.4(b). "The presence of a single badge of fraud is not sufficient to establish actual fraudulent intent; however, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose." *Whitaker v. Mortgage Miracles, Inc. (In re Summit Place, LLC),* 298 B.R. 62, 70 (Bankr. W.D.N.C. 2002). The presence of several badges of fraud leads to a presumption of fraudulent intent. *Kelly v. Armstrong,* 206 F.3d 794, 798 (8th Cir. 2000). The debtor can overcome the presumption by showing a "legitimate intervening purpose" for the transfers. *Acequia, Inc. v. Clinton (In re Acequia, Inc.),* 34 F.3d 800, 806 (9th Cir. 1994).

**Factors Other than Insolvency and Reasonably Equivalent Value**

It is undisputed that the Transfers were to insiders, and that control of the Residence and Lake House never changed from the time the properties were transferred to Thundertime to the time they were transferred back to the Coleys or thereafter. The evidence established that the February 2016 Transfers took place after the Coleys were on fair notice that Thundertime might become subject to the Judgment: DIRECTV had already filed a motion to pierce the corporate veil of Thundertime, and a lengthy hearing on the matter was held on November 19, 2015, during which the presiding judge made clear that he found the testimony of both Mr. and Mrs. Coley to lack credibility and forecasted that he was likely to pierce Thundertime's corporate veil. *See, e.g.*, Ex. 3 (Hearing Transcript) at 32-33.

The Coleys testified that they made the Transfers after a tax audit, contending that they had never indicated on their tax returns that the properties were transferred to Thundertime, and they were simply trying to "clean up" their taxes. R. Coley test., AP D.E. 48 at 167:5-8. However, the Coleys presented no evidence from their accountant or tax auditor to buttress their explanation,

14

nor does it appear from the evidence that there was any effort to "clean up" the taxes of the other various entities that would be reflected on Mr. Coley's individual tax returns as the single member of the LLCs.[13] Further, Mr. Coley was asked about a document entitled "Special Minutes of the meeting for It's Thundertime, LLC," dated February 16, 2016, reflecting an agreement that the properties would be "distributed back" into the original ownership and without any reference to repayment of a debt.

While not involving the properties at issue, other actions taken around the same time inform the determination of the intent behind the Transfers. In addition to the Transfers, after the November 19, 2015 hearing and including through and after the date that the Amended Judgment was entered (July 18, 2016), Thundertime sold the following properties:

| Address | Date of Sale | Sale Price |
| --- | --- | --- |
| 315 Jones Franklin Road, Raleigh | December 29, 2015 | $172,000 |
| 8146 McGuire Drive, Raleigh | January 8, 2016 | $74,000 |
| 1408 Highwood Court, Raleigh | January 15, 2016 | $140,000 |
| 114 Drummond Place, Cary | February 5, 2016 | $78,000 |
| 210 Concannon Court, Cary | February 16, 2016 | $117,000 |
| 2016 Henniker Street, Apex | July 11, 2016 | $350,000 |
| 1441 W. Market Street, Smithfield | August 19, 2016 | $45,000 |

BR D.E. 34 at 16 (reordered by date of sale).

After the sale of these properties and the Transfers, the following assets remained titled to Thundertime as of Mr. Coley's petition date:

| Address | Scheduled Value |
| --- | --- |
| 5917 Meadowlark Lane, Raleigh | $127,987 |
| 3101 Air Park Road, Fuquay Varina | $218,067 |
| 3008 Air Park Road, Fuquay Varina | $331,554 |
| 2441 Waco Commercial Court, Fuquay Varina | $75,141 |
| 3006 Air Park Road, Fuquay Varina | $101,620 |
| 505 Gooseneck Drive, Cary | $87,548 |

---

[13] As discussed below, while Thundertime owned and leased multiple rental properties, the rent payments were being made to other entities. It is not clear that those rental payments were turned over to Thundertime. It would seem this would be similarly problematic to a tax auditor, but there is no evidence of any effort to change that system.

15

| | |
|---|---|
| 2431 Waco Commercial Court, Fuquay Varina | $45,084 |
| 3004 Air Park Road, Fuquay Varina | $250,119 |
| 3006 Air Park Road E, Fuquay Varina | $101,620 |
| 3006 Air Park Road F, Fuquay Varina | $101,620 |
| 4336 Island Drive, N. Topsail Beach | $565,250 |
| 707 Grove Street NE, Wilson | $60,020 |

Ex. 11 at 6-7. The properties at 3101 and 3008 Air Park Road were subject to mortgages of $155,000 and $145,000, respectively, while the other properties were unencumbered. *Id.*

In addition to the real property transfers, several significant cash transactions took place between Thundertime and the Coleys. Specifically, the following checks were written from Thundertime's account:

| Payee | Check Number | Date | Amount |
|---|---|---|---|
| Kim Coley | 1219 | July 15, 2016 | $300,000 |
| Kim Coley | 1224 | August 9, 2016 | $65,000 |
| Cash | Counter Check 7047256 | July 26, 2016 | $400,000 |
| Cash | Counter Check 7061668 | March 31, 2016 | $245,470.89 |
| BB&T (Memo line reads "Cashiers Ck") | Counter Check 8727627 | June 9, 2016 | $100,000 |

Ex. 19. In a separate adversary proceeding pending before this court, *Sparkman v. Kimberli M. Coley et al. (In re Randy Coley)*, Adv. Pro. No. 19-0111-5-JNC, Mrs. Coley admitted that she received $765,000 from Thundertime in 2016, some of which was used to purchase real property.[14] *See* Adv. Pro. 19-0111-5-JNC, D.E. 8 at ¶¶ 26, 29. The checks show that $465,000 of that cash was transferred from Thundertime after entry of the Amended Judgment.[15]

---

[14] The Complaint alleges that the property was titled to Mrs. Coley's newly-formed LLCs, Coley Investment Group, LLC (formed on June 29, 2016) and KDMCLLC a/k/a KDMC, LLC (formed in 2019). It is unclear whether the Answer admits how the property is titled. *See* Adv. Pro. 19-00111-5- JNC, DE. 1 at ¶ 29; D.E. 8 at ¶ 29.

[15] Whether or not the transfers of cash are voidable (which will be determined in the separate adversary proceeding), those transfers inform the analysis of whether there was intent to hinder, delay, or defraud with respect to the transfer of the Residence and the Lake House.

The Coleys floated an explanation for all of the property transfers and cash transactions. With respect to the sales of real property, Mr. Coley maintained that Mrs. Coley could no longer keep up with maintaining the Thundertime properties once its property manager resigned:

> . . . I don't do real estate. That puts the whole entire Its Thundertime on my wife, every bit, and we – she couldn't handle it. It was so much. It was so much work my wife couldn't handle it so we started selling off – listen to me, this is very important, because me and my wife discussed this. We started selling off the non-performing and/or less, you know, value wise properties and they were all residential properties because that's what was really causing a lot of problems, heating and air going out, carpets messed up, trees fell in the back yard, and Kim couldn't handle that so we only sold our least expensive properties.

R. Coley test., AP D.E. 48 at 81:16-82:2. He noted that they kept the most valuable property, the beach house in North Topsail Island, in Thundertime. However, the "tremendous amount of revenue in rentals" earned from the beach house was paid to East Coast Sales, LLC, another Coley entity, not to Thundertime.[16] *Id.* at 82:12-83:7.

With respect to the cash, Mr. Coley testified, "She [Mrs. Coley] wanted her funds out of the – out of Its Thundertime and I had no problem." R. Coley test., AP D.E. 48 at 64:6-7.

> Q: Now, Mr. Coley, throughout 2016 – I mean, ultimately, Its Thundertime went from the beginning of 2016 of having hundreds of thousands of dollars in its account to having nothing in its account by the end of 2016, correct?
> A: Okay.
> Q: Is – do you have knowledge of that?
> A: Yes.

R. Coley test., AP D.E. 48 at 67:10-16.

> Q: So as soon as Judge Urbanski ordered the veil pierced for Its Thundertime, you started writing checks out of Its Thundertime into your wife's name personally, correct?
> A: My wife asked for her money. The company was solvent. The company had plenty of assets and she was owed what she was owed.

*Id.* at 70:3-9.

---

[16] Similarly, the rental payments on the commercial air park property were made to South Raleigh Air, LLC, not to Thundertime.

As noted, Mrs. Coley admitted to receiving $765,000 in cash from Thundertime, and that some of it was used to purchase real property in the name of Coley Investments, LLC.[17]

> A: . . . I purchased the properties because my son wanted to be involved in real estate and I wanted to help him do that. To bring him into Its Thundertime it was no longer protected. It wasn't a Coley entity so we created Coley Investments. And that's what I did.
> Q: And so Coley Investments you thought was protected?
>      * * *
> Q: And when you say protection you mean protected from your husband's creditors, correct?
> A: No, sir. I mean protection from somebody overreaching.
> Q: What do you mean overreaching?
> A: Going after something that doesn't belong to you.

K. Coley test., AP D.E. 48 at 139:1-16. With respect to the rest of the cash, she testified that "the money that was coming out of Its Thundertime was to pay me. . . . I do not know exactly where that money went [after that]." K. Coley test., AP D.E. 48 at 138:8-11.

At the same time, Mrs. Coley suggested that she believed she was leaving enough assets in Thundertime to satisfy DIRECTV: "*We* left the three million dollars [worth of real property] in Its Thundertime. I really wanted that to be a healthy thing so DIRECTV would go away. That's what I wanted." K. Coley test., D.E. 48 at 139:21-24 (emphasis added). However, no payments were ever voluntarily made to DIRECTV by the Coleys or the LLC's they controlled.

> Q: The one thing that you didn't do is you didn't either have Its Thundertime or have your husband have Its Thundertime pay anything on DIRECTV's judgment, right?
> A: Sir, that was not my call.

*Id.* at 141:9-12. Therefore, while Mrs. Coley suggested that she calculated the amount of assets needed to satisfy the judgment in an effort to negate intent to hinder, delay or defraud, her testimony confirms that the Coleys were aware at the time of the various transfers that the assets

---

[17] The creation of additional LLCs to manage real property is entirely inconsistent with the stated reason for Thundertime to divest itself of its rental properties, that Mrs. Coley "couldn't handle it."

of Thundertime were subject to DIRECTV's claims and that Mr. Coley had no plans to satisfy DIRECTV's judgment. The Coleys' actions speak louder than Mrs. Coley's self-serving testimony.

**Insolvency**

Two of the factors for determining actual intent pursuant to § 39-23.4(a)(1) overlap with the factors for determining whether a transfer is voidable under § 39-23.4(a)(2): reasonably equivalent value and insolvency. Indeed, whether or not the assets remaining in Thundertime were actually sufficient to satisfy DIRECTV's claim largely answers the insolvency question.

Parties presented competing evidence to demonstrate the solvency or insolvency of Thundertime at the relevant time. Each created a "demonstrative exhibit" Thundertime Balance Sheet about which Mr. and Mrs. Coley answered questions. Based on the exhibits and testimony, the parties agree that Thundertime had the following liabilities as of February 16, 2016 (the date of the Transfers, used by the Coleys on their demonstrative Balance Sheet) and as of August 31, 2016 (the date used by the Trustee on his demonstrative Balance Sheet, representing a date shortly after the Transfers and after the order to stop transferring assets):

| | |
|---|---|
| DIRECTV Judgment | $2,687,870.96 |
| Michael D. Canup | $149,099.50 |
| Clyde W. Canup | $115,629.97 |
| **TOTAL** | **$2,952,600.45** |

In addition, Mrs. Coley contends that she is owed $800,000 by Thundertime, and she includes that amount in her balance sheet analysis. However, Mrs. Coley's only claim filed in the bankruptcy case, Claim No. 8-1, is a claim against Mr. Coley for negligence and breach of fiduciary duty due to his losses in the Virginia Litigation, resulting in what she contends is the

"loss of her interest in . . . the assets of" Thundertime[18] in the amount of $1,603,406.50 (or one-half of what she contended at the time was the value of the assets remaining in Thundertime on the Petition Date). Nothing in the record supports her asserted $800,000 figure, or that Mrs. Coley is owed anything from Thundertime other than to the extent it is derivatively liable for all of Mr. Coley's obligations due to the alter ego stipulation. Further, there has been no determination of liability for the negligence or breach of fiduciary duty claims. Finally, the claim is subject to an objection that will be considered in conjunction with other litigation in the chapter 7 case. Accordingly, the court will not consider the $800,000 unliquidated and disputed liability to Mrs. Coley listed on her demonstrative Balance Sheet (a decision that weighs in favor of Thundertime's solvency).[19]

The parties disagree on the specific assets to be included in the balance sheet determination as well as the value of those assets. The parties agree that the following properties were owned by Thundertime on the date of the Transfers:

> 5917 Meadowlark Lane, Raleigh
> 3101 Air Park Road, Fuquay Varina
> 3008 Air Park Road, Fuquay Varina
> 2441 Waco Commercial Court, Fuquay Varina
> 3006 Air Park Road, Fuquay Varina
> 505 Gooseneck Drive, Cary
> 2431 Waco Commercial Court, Fuquay Varina
> 3004 Air Park Road, Fuquay Varina
> 3006 Air Park Road E, Fuquay Varina
> 3006 Air Park Road F, Fuquay Varina
> 4336 Island Drive, N. Topsail Beach
> 707 Grove Street NE, Wilson

---

[18] Never mind that even if Mrs. Coley were a member of Thundertime, she would have no interest in its *assets* to lose, but could only lose the value of her shares.

[19] It is not clear why the BB&T mortgages were not included in either party's balance sheet, as Thundertime was the primary obligor on the mortgages secured by the Residence and the Lake House before and after the Transfers. Both the Coleys (via their guarantee) and Thundertime as the maker of the promissory note are liable to BB&T.

Mrs. Coley maintains that there are three other properties that were acquired shortly after the Transfers that should be included among Thundertime's assets:

> 1405 Highview
> 51 Poppy
> 1441 W. Market

Apparently Thundertime no longer held those assets as of the Trustee's demonstrative Balance Sheet date of August 31, 2016.[20] In addition, the Coleys' demonstrative Balance Sheet reflects cash on hand as of February 29, 2016 of $446,869.02, while the cash on hand on the Trustee's demonstrative Balance Sheet (as of August 31, 2016) was only $11,739.27, reflecting a significant decrease in the balance sheet assets after the Transfers and after entry of the Amended Judgment.

The parties also disagree as to the proper value of the various real estate assets. The Trustee notes that all of the properties that were owned by Thundertime as of the Petition Date have been sold by him (or were under contract as of the trial date) in court-approved transactions made under § 363 of the Bankruptcy Code after notice and opportunity for objection.[21] These sales tested the market and provide a strong indication of the values despite the passage of time between the relevant valuation dates in 2016 and the sale dates in 2019. Other potential indicators of value include the tax value and the value attributed to the properties on Schedule A when Mr. Coley filed his petition and the Related Entities Report, both of which were submitted and signed by him under penalty of perjury.

---

[20] The three properties were sold by Thundertime in 2016. Mrs. Coley testified that the income from the sold properties went into Thundertime's account, and Thundertime used the funds to "[pay] down debt." K. Coley test., D.E. 49 at 33:1-8. This testimony is inconsistent with the Coleys' assertion that Thundertime essentially had no debt and with Mrs. Coley's admission that she received $765,000 in cash from Thundertime in 2016.

[21] Neither Mr. Coley as the debtor nor Mrs. Coley as a purported creditor of Mr. Coley in his chapter 7 case, or Thundertime if considered separately, objected to the sales or the proposed sale prices.

In addition to the three valuation categories listed above, the Coleys' demonstrative Balance Sheet includes an "Owner's Estimate" of value for each property to support their solvency analysis. Mr. Coley testified about these values of the various properties, while expressing doubt as to Mrs. Coley's ability to give such opinions.

> Q: . . . And I believe you've testified throughout that Its Thundertime was Mrs. Coley's company and that she was the one that handled the real estate, correct?
> A: She handled buying outside the real estate, yes, sir.
> Q: So, she's the one who's in position to give opinions concerning value, not you, correct, Mr. Coley?
> A: No. I helped organize this because I'm the only one, Mr. Sanderson, that does the office work. My wife works – buys the houses, she fixes up the houses, she makes the houses nice, she improved the houses. She does none of the paperwork, none of it. She does none of the paperwork. I do all the office stuff. And with you asking her questions about number [sic], *she has no clue*, to be honest because I do that. . . .

R. Coley test., D.E. 49 at 7:15-8:2 (emphasis added). Mr. Coley further questioned Mrs. Coley's inclusion of an encumbrance listed on one of the assets in Exhibit D, a document provided in discovery: "If my wife prepared this, again, that is one of the issues that I think that my wife gets conflicted because she doesn't do the banking work. She just doesn't do it." *Id.* at 10:16-18. At the same time, Mr. Coley repeatedly testified that he is in the cable business, and his wife handles the real estate. *See, e.g.*, R. Coley test. AP D.E. 48 184:4-6 ("I'd have to almost confer with my wife. She knows real estate better than I do."); *Id.* at 109:24 ("I'm no real estate guy.").

As noted, the Coleys' demonstrative Balance Sheet lists the tax value, "owner's estimate," Schedule A value, and ultimate sale price of each property. The total values, including cash on hand as of the date of the Transfers of $446,869.02 and the sale prices for the three properties that were purchased and sold between February 16 and August 31, 2016,[22] are as follows:

---

[22] The three properties, Highview, Poppy, and W. Market, are included only in the "Purchase Price" total.

Tax values: $2,633,675.02
Owner's Estimate: $4,459,969.02
Schedule A: $2,832,139.02
Sale Price: $2,504,369.02

Of the proposed values, only the "Owner's Estimate" values result in asset values greater than the agreed liabilities of $2,952,600.45. Thus, the court need only evaluate the trustworthiness of those purported values to determine whether Thundertime was balance sheet solvent on either February 16, 2016 or August 31, 2016.

The real property values on the Coleys' demonstrative Balance Sheet follow:

| Address | Tax Value | Owner's Estimate | Schedule A | Purchase Price |
|---------|-----------|------------------|------------|----------------|
| 707 Grove Street | $60,020 | $60,000 | $60,020 | $26,000 |
| 5917 Meadowlark | $127,987 | $186,000 | $127,987 | $120,000 |
| 505 Gooseneck | $87,548 | $200,000 | $87,548 | $111,000 |
| 2431 & 2441 Waco Comm'l Ct. | $75,141 (2431 only) | $150,000 | $120,225 | $134,000 |
| 4336 Island Drive | $565,250 | $1,000,000 | $282,625[23] | $437,000 |
| 3101 Air Park Rd. | $218,067 | $558,000 | $218,067 | $240,000 |
| 3008 Air Park Rd. | $331,554 | $539,800 | $331,554 | $150,000 |
| 3006 Air Park Rd. | $101,620 | $369,000 | $255,000 | $359,747 |
| 3004 Air Park Rd. | $250,119 | $580,800 | $125,059.50 | $215,000 |
| **Total** | **$1,817,306** | **$3,643,600** | **$2,015,770** | **$1,688,000** |

While it is not clear who created the demonstrative Balance Sheet or determined the values, Mr. Coley testified about the "Owner's Estimate" values. *See* R. Coley test., AP D.E. 47 173:18-184:16. He admitted that he was not as familiar with a "cap rate" in Wilson County, so he used the tax value for the property that was his parents' home on Grove Street. He testified that Mrs. Coley had been renovating the Meadowlark property and stopped mid-renovation, but it had previously generated "good rental income." He valued the Gooseneck property at $200,000 because other properties in the area had sold for that amount, noting that he had "heard from Kim" and from his

---

[23] For reasons that are unclear given that these properties were titled to Thundertime, Mr. Coley scheduled only one-half of tax value for the Island Drive and 3004 Air Park Rd. properties as his one-half interest. However, the Coleys appropriately added the entire tax value in their demonstrative Balance Sheet to reach the total Schedule A real property value asserted of $2,015,770.

"real estate guy" that properties on Gooseneck were selling. For the Waco Commercial Court properties, Mr. Coley testified that he used the price the Coleys paid of $75,000 per lot.

Mr. Coley further testified that Mrs. Coley received an offer to purchase the property on Topsail Island in the amount of $1.2 million. R. Coley test., AP D.E. 48 at 82:5-8. He also testified that the tax value was "particularly low," because there was litigation over the tax assessments in Onslow County resulting in a reduction in tax values with an increase in the tax rate. *Id.* at 111:2-17. In fact, he testified that the value of just the "dirt is $450,000." *Id.* At the same time, he scheduled the value as $565,250 in the Related Entities Report, based on the tax value.

The Air Park properties are part of an airport. There are hangars on the properties, each of which has an office that is air-conditioned and carpeted. Thundertime's office is in one of the buildings. The Coleys contend that they paid $150,000 for each of the buildings that they constructed after purchasing the properties, and Mr. Coley orally amended the value he placed on the 3006 Air Park Road property to $600,000. In explaining his determination of the values of the other Air Park properties, Mr. Coley testified:

> Well, it's a capitalization – these are commercial buildings, unique, they're very unique, they're very – and they're in high demand. They're in high demand, that's a big key. And the people that rent them pay their bills. So – and it's in Wake County. . . .  And what you do is a capitalization rate on that because one, it's a commercial building so there's value in the raw building itself. And what you do is also value the income, the leases. The leases on these buildings would go with the sale. They were worth something.
>
> It wasn't just buying a building at tax value. You were buying a building with tenants in it, paying tenants, day 1. So there's a capitalization rate you can use and it's a common method that real estate people do with commercial, residential properties, too if they're in high demand. But certainly all commercial properties that are leased have – are considered up in capitalization rates.

R. Coley test., D.E. 48 at 182:17-183:8.

On cross-examination, Mr. Coley acknowledged that there were no appraisals to support his estimates, contending that "we've always owned the property. There's no need in doing an

appraisal." R. Coley test., AP D.E. 49 at 7:10-14. In addition, Mr. Coley used the tax values for his Schedule A and Related Entities Report, both of which were submitted under penalty of perjury, without any indication that he believed the values were significantly higher.

Mrs. Coley also testified concerning the asserted real estate values, contending that property values are "a mathematical equation where it's so much per square footage that you use," then consider "whether there is hardwood floors or granite or tile," and the neighborhood. K. Coley test., D.E. 49 at 24:16-25:2. She, too, reviewed the "Owner's Estimate" values on the demonstrative Balance Sheet and confirmed that she believed those values to be accurate. Mrs. Coley maintains that the tax value is a baseline, and square footage and location are used to add to the value. *Id.* at 34:4-40:5.

On cross-examination, the Trustee showed Mrs. Coley Exhibit 43, which was a schedule of values she provided for the Thundertime properties as of February 1, 2016 in response to written discovery. For each property, Mrs. Coley listed the corresponding ad valorem tax value.

> Q: . . . And so there was nothing here that indicated that the values of the properties, as you swore under oath that they were, were greater than the tax assessed value, correct?
> A: Simplistic. Yes, sir.

K. Coley test., AP D.E. 49 at 68:6-9. In addition, with respect to the Air Park Road properties, Mrs. Coley admitted that the properties had flooded three times in recent memory, that there is an underground storage tank at the facility with some cost to remove and remediate, that five properties are serviced by only one well, and that some of the airplane hangars do not have any water access. With respect to the water access issue, she testified:

> A: Because it's an airplane hangar and airplanes don't need water.
> Q: But people who fix airplanes need water, right?
> A. But they don't normally drink from a hose.

*Id.* at 70:4-7.

The problem for the Coleys is that throughout this eight-year saga beginning in 2011 when DIRECTV filed the Virginia Litigation, their only consistency has been their varying and entirely incredible testimony and written positions. Every deposition, live court testimony, and discovery answer considers first and foremost, "what is in my current best interest?" Both habitually give the testimony that is convenient for them at the time without concern for earlier or later inconsistent and at times wholly opposite positions and statements.[24] When it was worthwhile to downplay the property values, they both submitted under oath that the tax values were the true values of the Thundertime assets; now that they need to show that Thundertime was solvent with assets greater than the amount of its debts (including the DIRECTV judgment), they contend those same properties are worth as much as twice the tax value. The motivation for the change in their sworn statements is blatantly and transparently obvious.

Further, neither Mr. Coley nor Mrs. Coley gave a detailed and independently verifiable basis for the asserted values. While Mr. Coley referenced a "capitalization rate" (a term with which this court has much familiarity after valuing numerous properties based on the testimony of certified appraisers), he never explained what rate he used or how he derived it. Instead, he summarily said "there's a capitalization rate you can use." R. Coley test., D.E. 48 at 183:4. The Coleys did not produce even a sliver of independent evidentiary demonstrable support for the sudden change in values. Accordingly, the court finds that the "Owner's Estimate" values on the demonstrative Balance Sheet submitted by the Coleys are without sufficient basis.

---

[24] Judge Urbanski also noted the extensive inconsistency of the Coleys' testimony given under oath in the Virginia Litigation, but this court need not and does rely upon his observation on this subject. Mr. Coley and Mrs. Coley testified before this court for two days, and this court makes independent findings on credibility based on its own observation of their testimony and behavior at trial and review of the evidence in this matter.

Based on the rejection of the "Owner's Estimate" values, under any other calculation of real property values, plus the value of cash on hand of $446,869.02 and exclusive of the asserted liability of Mrs. Coley in the amount of $800,000, Thundertime was balance sheet insolvent on the date of the Transfers. If the BB&T mortgages on the Residence and Lake House are also included in the liabilities, Thundertime is pushed even further into the red. And, to the extent equity in the Residence and the Lake House may have rendered Thundertime solvent prior to the Transfers under any method of valuation, the Transfers themselves shifted Thundertime's balance sheet into the negative as contemplated by the "badge of fraud" reading, "The debtor was insolvent or became insolvent shortly after the transfer was made . . . ."

**Reasonably Equivalent Value**

The other factor that is considered in both § 39-23.4(a)(1) and § 39-23.4(a)(2) is whether Thundertime received reasonably equivalent value for the Transfers. Value is defined as having been given when, "in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied." N.C. Gen. Stat. § 39-23.3. It is undisputed that no cash changed hands for the Transfers, and no excise taxes were paid. The Trustee maintains that there was no reasonably equivalent value given for the Transfers, while the Coleys maintain that the Transfers were in satisfaction of the (undocumented) debt that was incurred when the Coleys transferred the properties to Thundertime in the first place. This issue was also included in the parties' post-trial briefing.

The Trustee maintains that the Transfers were distributions of capital to the Coleys, which are not value to Thundertime and are not considered given in exchange for antecedent debt. Specifically, capital contributions and membership interests are not debt; thus, the return of capital is not in payment of debt. *See* AP D.E. 51 at 8-9 and cases cited therein.

The Coleys, on the other hand, contend that "the proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors. As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred." *See* AP D.E. 52 at 11, quoting *Harman v. First American Bank of Maryland* (*In re Jeffrey Bigelow Design Grp.*), 956 F.2d 479, 484 (4th Cir. 1992).

With respect to Mrs. Coley, the defendants contend that her interest in Thundertime "was effectively stripped away" in the Virginia Litigation.

> Without the ability to claim a membership interest, Kimberli Coley was left with a creditor interest since she conveyed value into ITT and it was not done gratuitously. Upon the return of title to the Wake and Warren County Properties, Kimberli Coley's creditor interest was reduced by the corresponding return of value by ITT. From the perspective of unsecured creditors, they are no worse off since there was a zero-net effect on the estate. Thus, an antecedent debt was repaid, and as a result, reasonable equivalent value was exchanged.

AP D.E. 52 at 12.

With respect to Mr. Coley, they contend that the veil-piercing resulted in a zero net-impact on his bankruptcy estate:

> With respect to Randy Coley, like Kimberli's contributions, the Wake and Warren County Properties were not conveyed gratuitously to ITT. Randy Coley was to receive membership interest for his conveyances. When ITT's corporate veil was reverse-pierced in the Virginia Litigation the assets of ITT became available to satisfy Randy Coley's creditors, specifically DirecTV. Thus, the transfer of the Wake and [Warren] County Properties to Randy Coley had a zero-net effect on the bankruptcy estate. As a result, reasonable equivalent value was exchanged.

*Id.*

Several problems exist as to both of the Coleys' arguments. With respect to Mr. Coley, the "net effect on the estate" argument ignores that the Coleys purported to take the Transfers as tenants by the entireties, which would shield the assets from all of Mr. Coley's individual creditors

and thus remove it from the bankruptcy estate. Had the Transfers not taken place, all of the equity in the Residence and the Lake House would be available for distribution to Mr. Coley's creditors through the pierced veil of Thundertime – a $550,000 net impact on the estate.

With respect to Mrs. Coley, the argument that her claims against the estate have been reduced by the value of the Transfers and thus have a zero-net effect on the estate also fails to recognize the true impact of the Transfers. As an initial matter, and as discussed above, Mrs. Coley's claim against the estate as filed does not reflect any debt owed to her by Thundertime; instead, it is an unliquidated and disputed claim based on her potential loss of interest in the "assets of Thundertime" due to Mr. Coley's negligence and breach of fiduciary duty. If Mrs. Coley contends that her contributions of property to Thundertime created a debt that could be satisfied through the return of those properties to her name, she would have a monetary claim for all of the other properties that she and Mr. Coley contributed to Thundertime at its formation without resort to a claim for negligence or breach of fiduciary duty. Further, there is no evidence that she reduced her claim by the value of the Residence and the Lake House, and there is no evidence that the contributions of those or any other properties were treated as debt by Thundertime or that Thundertime's books showed that the Coleys expected to be repaid. All of the evidence shows that the properties were contributed as equity, and the transfers were distributions.[25]

In addition, the "net impact" analysis would require a calculation similar to that conducted in determining whether a creditor received a preference under 11 U.S.C. § 547; specifically, whether a payment allowed a creditor to receive more than it would have in a hypothetical chapter

---

[25] While Mrs. Coley has been precluded from asserting a membership interest in Thundertime, she testified unequivocally that at the time she contributed the properties to Thundertime, she believed she was a 50% member and that her contributions of property made her so. She called into question the surrender and loss of her ownership interest claims in the Virginia Litigation and apparently has never reconciled that outcome internally. Regardless, there is no question that all of the property was transferred to Thundertime as contributions to equity.

7 had the payment not been made. Here, Mrs. Coley asserts a claim against the estate. The claim is not entitled to priority, nor is it a secured claim. As a result, it is on par with the claim of DIRECTV. It is clear that the filed claims will not be paid in full. To the extent Mrs. Coley actually reduced her claim by the value of the Transfers, of which there is no evidence, then she received a dollar-for-dollar payment where she would receive only cents on the dollar had the Transfers not been made and her claim been paid through the bankruptcy.

Based on the evidence presented at trial, the court finds that Thundertime did not receive reasonably equivalent value for the Transfers. The Transfers were a return of capital, which as a matter of law is not value to the transferor. *See Hayes v. Palm Seedlings Partners-A (In re Agricultural Research and Technology Group, Inc.)*, 916 F.2d 528, 540 (9th Cir. 1990) (distributions on account of equity security interests are not value because any other definition would not further protection of creditors as contemplated by the stated purpose of the Uniform Fraudulent Transfer Act).

### Summary of Factors Reflecting Actual Intent

As noted above, not all of the "badges of fraud" must be present to determine that the Transfers are avoidable. Here, the factors weigh heavily against the Coleys. The court rejects the proffered reason for the Transfers because, as discussed above, the Coleys' testimony simply is not credible. Further, no independent evidence was offered to support their claim that they transferred the properties for tax reasons, and no corroborating evidence of other efforts to "clean up" their taxes was presented.[26]  Instead, the court finds that the Transfers were part of a concerted effort to keep cash and assets out of Thundertime and protected from Mr. Coley's creditors by the

---

[26] There was also no evidence that this transfer back was reported on the Coleys' personal tax returns and whether a gain (or loss) was transferred. From the testimony, the court gleans that nothing has been reported.

attempted transfer to the Coleys as tenants by the entireties. While Thundertime may have been left with a few properties (with rental payments directed elsewhere), those assets were not nearly enough to satisfy its obligation to DIRECTV.

To the Coleys, the trial of this adversary proceeding revealed the efforts of the Coleys to shield assets from creditors, particularly DIRECTV. The claim of DIRECTV arises from the multi-year resale of pirated satellite television programing that resulted in a $2,393,000 final and nonappealable judgment in the Virginia Litigation for what is, at its core, a claim for fraud and larceny. The Transfers were made in a bald effort to avoid paying the DIRECTV judgment and in direct defiance of the district court in Virginia. The Transfers themselves and incredible testimony given at this trial demonstrate that the Coleys have not accepted and never will accept responsibility for their actions. They have both again given sworn testimony they perceive to be currently advantageous, regardless of how tenuous a relationship their statements may have to the truth as established in the Virginia Litigation. They only have themselves to blame for failing to get this matter behind them before now.[27] The evidence, including the incredulity of their own testimony, overwhelmingly displays that the Transfers were made with the actual intent to hinder, delay, or defraud DIRECTV. Consequently, the court concludes that the Transfers are avoidable pursuant to North Carolina General Statute § 39-23.4(a)(1).

**Made without Receiving Reasonably Equivalent Value while the Debtor was Insolvent**

North Carolina General Statute § 39-23.4(a)(2) provides that a transfer may be avoided if the transfer was made

> Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

---

[27] Their persistent and unyielding battle with DIRECTV brings to mind the last lines of <u>The Great Gatsby</u> (by F. Scott Fitzgerald): "So we beat on, boats against the current, borne back ceaselessly into the past."

a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

b. Intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

N.C. Gen. Stat. § 39-23.4(a)(2).

The first element of this provision is that the transferor did not receive reasonably equivalent value as nothing was paid for the Transfers. As discussed in conjunction with § 39-23.4(a)(1), above, the court has concluded that Thundertime did not receive reasonably equivalent value for the Transfers.

The second element of this provision, which is in the disjunctive, is the equivalent of the insolvency analysis detailed above. Specifically, Thundertime (through Mr. Coley) understood at the time of the Transfers that it was about to be held liable for the DIRECTV judgment, which was beyond its ability to pay based on the assets remaining in Thundertime.

As a result, the court concludes that the Trustee may avoid the Transfers pursuant to North Carolina General Statutes § 39-23.4(a)(2).

## CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the court determines as follows:

1.     The deed purporting to transfer the Residence to Mr. and Mrs. Coley as tenants by the entireties is null and of no effect due to the defective signature of the Grantor;

2.     Even if the deed is valid, the transfer of the Residence to Mr. and Mrs. Coley as tenants by the entireties is an avoidable transfer pursuant to North Carolina General Statutes § 39-23.4(a)(1);

3.     Even if the deed is valid, the transfer of the Residence to Mr. and Mrs. Coley as tenants by the entireties is an avoidable transfer pursuant to North Carolina General Statutes § 39-23.4(a)(2);

4. The transfer of the Lake House to Mr. and Mrs. Coley as tenants by the entireties is an avoidable transfer pursuant to North Carolina General Statutes § 39-23.4(a)(1);

5. The transfer of the Lake House to Mr. and Mrs. Coley as tenants by the entireties is an avoidable transfer pursuant to North Carolina General Statutes § 39-23.4(a)(2);

6. The Residence and the Lake House are hereby declared property of the bankruptcy estate; and

7. The Trustee may recover the Property or the value of the Property from the Defendants, Randy P. Coley and Kimberli Coley, pursuant to 11 U.S.C. § 550(a)(1).

A separate judgment will be entered.

## END OF DOCUMENT